**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | |
|---|---|
| Diana Olson, on behalf of herself and her children as heirs at law of Richard Olson, deceased; and Diana Olson as Personal Representative of the Estate of Richard Olson,<br><br>        Plaintiff,<br><br>vs.<br><br>Ford Motor Company, a Corporation,<br><br>        Defendant. | **ORDER ON MOTIONS IN LIMINE (ALCOHOL EVIDENCE)**<br><br>Case No. 4:04-cv-102 |

Before the Court are four motions in limine concerning alcohol-related evidence: Ford Motor Company's Motion in Limine No. 7 to Exclude Alcohol Opinion of Todd Polumbo (Docket No. 80); Ford Motor Company's Motion in Limine No. 9 to Exclude Expert Testimony of Anne Rummel Manly (Docket No. 82); Olson's Motion in Limine No. 2 to Exclude Reference to Alcohol Consumption (Docket No. 86); and Olson's Motion in Limine No. 13 Regarding Cumulative Expert Testimony by Ford Regarding Alcohol (Docket No. 97). Each motion was filed on January 6, 2006. Responses have been filed as to each motion.

**I.    BACKGROUND**

During the evening hours of September 17, 2002, Richard Olson consumed alcoholic beverages at the clubhouse of the Minot Country Club. Olson departed the Minot Country Club shortly after 11:00 p.m. At approximately 11:12 p.m, Olson was killed in a one-car automobile accident approximately a quarter mile from the clubhouse. Olson's body was taken directly to the

funeral home in Minot, North Dakota.

On September 18, 2002, the Ward County Coroner, Dr. John Smith, came to the funeral home. Dr. Smith attempted to draw a blood sample but was unable to do so. See Deposition of John C. Smith, pp. 22-23. Instead, Dr. Smith drew urine and vitreous humor. Id. at 39. Vitreous humor is the fluid in the eye that maintains the shape of the globe of the eye. Id. at 25. It was removed using a disposable needle and syringe provided to Dr. Smith in a toxicology kit from the North Dakota State Crime Lab. Id. at 29. The particular needle and syringe used on Olson had never been used before. Id. After removing the vitreous humor from both eyes, it was combined and placed into a clear plastic screw-top tube. Id. at 43-44. The tube containing the vitreous humor did not contain preservative. Id. at 79. A urine sample was also drawn with an unused needle and syringe and placed in a plastic screw-top tube. Id. at 44, 46. The tube of urine did contain preservative. Id. at 79. The samples were mailed to the North Dakota State Crime Lab that same day. Id. at 45.

The next day, September 19, 2002, the samples were logged in at the North Dakota State Crime Lab. See Deposition of Claudia Meberg, p. 21. Upon receipt, Claudia Meberg, an employee at the North Dakota State Crime Lab did not observe spillage in either sample. Id. at 26. Meberg ran standards to test the equipment prior to testing the samples– the standards tested out. Id. at 28-29. The urine sample was not tested for alcohol concentration in September 2002. Id. at 36. The vitreous humor sample was found to contain .22 percent alcohol by weight. See Toxicology Report dated 10/30/2002.

On September 21, 2002, Ward County Sheriff's Deputy Todd Polumbo completed a Motor Vehicle Crash Report regarding the Olson accident. In the "Officer's Narrative" section of that report, Deputy Polumbo wrote "It does not appear alcohol was a contributing factor to the crash."

See Motor Vehicle Crash Report, dated September 21, 2002. Deputy Polumbo based that conclusion on two things: (1) he did not smell an odor of alcohol in the vehicle shortly after the accident; and (2) Bruce Ruppert, the Minot Country Club superintendent, told him that Olson had consumed only a limited number of alcoholic beverages. See Deposition of Deputy Todd Polumbo, pp. 36-39. Ruppert had spoke with the bartender at the clubhouse and the individual who drives the drink cart out on the golf course. Id. at 37-38.

In March of 2003, Olson's attorney requested that the vitreous humor sample be retested and that the urine sample be tested for alcohol concentration. See Letter from Steven Storslee to Margaret Pearson, dated March 19, 2003. The alcohol concentration in the urine sample was .06 grams per 67 mls of urine. See Letter from Margaret Pearson to Steven Storslee, dated May 5, 2003. The vitreous humor sample was retested four times. The lab reported the following results in conjunction with the original result:

| **Vitreous Analyses Dates** | **Alcohol Concentrations** |
| --- | --- |
| 09/19/02 | 0.226 |
| 03/14/03 | 0.128 |
| 03/20/03 | 0.135 |
| 04/02/03 | 0.125 |
| 04/16/03 | 0.095 |

Id. In her letter of May 5, 2003, State Toxicologist Margaret Pearson explained that the gradual decrease in the alcohol concentration may be attributed to the use of a screw-top tube as opposed to a vacutainer tube.

The defendant, Ford Motor Company ("Ford"), has retained three expert witnesses to testify about the conversion of vitreous humor results to blood alcohol concentration. Each expert utilized the vitreous sample result of .22 generated on September 19, 2002. The experts have varying opinions as to the exact blood alcohol concentration, but all agree that Olson's blood alcohol

concentration exceeded .10 percent.  See Deposition of Alan C. Donelson, p. 52; Deposition of Richard T. Mason, p. 33; Deposition of Lowell C. Van Berkom, p. 33.  Ford's experts also intend to offer opinions regarding the urine sample.  Olson has retained expert Anne Rummel Manly to contest the scientific reliability of the vitreous humor and urine samples.

## II.   LEGAL DISCUSSION

### A.   EYEWITNESSES

The plaintiff, Diana Olson, seeks to exclude any and all evidence regarding alcohol consumption.  Alternatively, Olson seeks to exclude all such evidence except testimony from eyewitnesses who actually saw Richard Olson in an intoxicated state at the Minot Country Club during the evening of the accident.

It is undisputed that several people witnessed Olson consume alcohol before leaving the Minot Country Club the evening of September 17, 2002.  None of the eyewitnesses will apparently testify that Richard Olson was intoxicated.  Under the Federal Rules of Evidence, all "relevant evidence" is admissible, unless otherwise prohibited.  See Fed. R. Evid. 402.  "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is in consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  The trial court has broad discretion in deciding whether to admit evidence at trial.  See Fortune Funding LLC v. Ceridian Corp., 368 F.3d 985, 990 (8th Cir. 2004).

There is no question that testimony concerning Olson's alcohol consumption or lack of consumption is relevant in this wrongful death action.  The relevancy of the decedent's alcohol consumption is bolstered by the fact that Ford has pled contributory negligence or comparative

negligence as an affirmative defense. Olson has cited no authority for the proposition that such eyewitness testimony should be inadmissible.[1] The jury will be charged with the ultimate task of determining the cause of the fatal accident. The Court finds that evidence relating to alcohol consumption on the part of the decedent, Richard Olson, will aid the jury in that determination. The use of alcohol and its effects, if any, on Olson are factors that should be considered by the jury in their determination of whether Olson's action contributed in any manner to the cause of the fatal accident. All parties will have sufficient opportunity to examine and cross-examine the witnesses who testify regarding this subject. There is no question that evidence of the decedent's alcohol consumption and level of impairment will be of significant importance in this case, but such evidence is without question relevant to the issues of fault and causation.

It is well-established that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Unfair prejudice relates to the risk that the jury will decide the case on an improper basis. Nichols v. American Nat. Ins. Co., 154 F.3d 875, 885 (8th Cir. 1998). No such concerns exist with respect to eyewitness testimony in this case. Both parties will be allowed to present evidence regarding Olson's alcohol consumption in the form of eyewitness testimony.

### B.   VITREOUS HUMOR AND URINE SAMPLE

As an extension of the previous argument, Olson seeks to exclude the testimony of Ford's

---

[1] In fact, Olson states that "Bruce Ruppert and the Country Club employees will testify at the trial of this case." Plaintiff's Response to Ford's Motion in Limine No. 7, p. 3.

three expert witnesses concerning the conversion of the vitreous humor fluid to a blood alcohol concentration level. Olson cites to Section 39-20-07 of the North Dakota Century Code to support her argument. Olson also challenges the admissibility of such testimony under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). Ford also seeks to exclude Olson's expert witness, Anne Rummel Manly, on <u>Daubert</u> grounds. In addition, if testimony is allowed on the subject, Olson requests that Ford be limited to a single expert.

### 1) **NORTH DAKOTA CENTURY CODE § 39-20-07**

Section 39-20-07 of the North Dakota Century Code provides, in part, as follows:

> **Interpretation of chemical tests.** Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor, drugs, or a combination thereof, evidence of the amount of alcohol, drugs, or a combination thereof <u>in the person's blood at the time of the act alleged as shown by a chemical analysis of the blood, breath, saliva, or urine is admissible.</u>

(emphasis added). The North Dakota Supreme Court has explained that "[t]he purpose of N.D.C.C. § 39-20-07 is to ease the requirements for the admissibility of chemical test results while assuring that the test upon which the results are based is fairly administered." <u>City of Bismarck v. Bosch</u>, 691 N.W.2d 260, 263 (N.D. 2005) (citing <u>Lee v. North Dakota Dep't of Transp.</u>, 673 N.W.2d 245 (N.D. 2004)). Olson cites to Section 39-20-07 for the proposition that all non-listed testing methods, which would include vitreous humor, are inadmissible at trial for purposes of determining the blood alcohol content of an individual.

Federal jurisdiction is this case is based upon 28 U.S.C. § 1332. <u>See</u> Complaint, ¶ 3. Under the <u>Erie</u> doctrine, a federal court sitting in diversity must apply state substantive law and federal

procedural law.  See Erie R.R. Co. v. Tomkins, 304 U.S. 64 (1938).  It is well-established that in general, "federal courts are not bound by state law when determining the admissibility of evidence." Clark v. Martinez, 295 F.3d 809, 813 n.4 (8th Cir. 2002).  Issues of admissibility of evidence in diversity cases are generally questions of federal law.  Id. ("Questions of the relevance and admissibility of evidence are questions of federal law."); Sprynczynatyk v. General Motors Corp., 771 F.2d 1112, 1122 (8th Cir. 1985) ("Questions such as burden of proof, presumptions, competency, and privileges are generally questions of state law, but issues of admissibility of evidence are questions of federal law."); Warner v. Transamerica Ins. Co., 739 F.2d 1347, 1351 n. 6 (8th Cir. 1984).  To that end, several courts have held that the admissibility of evidence regarding intoxication is governed by federal law.  See McInnis v. A.M.F., Inc., 765 F.2d 240, 244 (1st Cir. 1985); Levitt v. H.J. Jeffries, Inc., 517 F.2d 523, 525 (6th Cir. 1975); Hansen v. General Motors Corp., 915 F. Supp. 118, 121 (E.D. Mo. 1996); Huss v. United States, 738 F. Supp. 1098, 1110 n.25 (W.D. Mich. 1990); but see Rovegno v. Geppert Bros., Inc., 677 F.2d 327, 329 (3d Cir. 1982) (applying state law to determine the admissibility of evidence concerning an individual's alcohol consumption).

     Neither the North Dakota Supreme Court, nor the Eighth Circuit Court of Appeals, have had occasion to address whether Section 39-20-07 of the North Dakota Century Code is substantive or procedural in nature.  The Eighth Circuit has endorsed a general rule that issues of admissibility of evidence are procedural in nature and therefore governed by federal law.  Following that pronouncement, the Court finds that Section 39-20-07 of the North Dakota Century Code is procedural in nature.  The Federal Rules of Evidence, not Section 39-20-07, will determine the admissibility of the vitreous humor evidence in this case.  Even if Section 39-20-07 was considered

to be substantive in nature, the Court would reach the same conclusion because Section 39-20-07 does not preclude the use of other reliable, scientific methods to assess the level of alcohol concentration in an individual.

### 2)	DAUBERT CHALLENGE

Rule 702 of the Federal Rules of Evidence sets forth the standard for expert testimony and provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 requires the trial judge to act as a "gatekeeper" and admit expert testimony only if it is relevant and reliable. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). In Daubert, the Supreme Court charged trial courts with the responsibility of screening such testimony for reliability by assessing the expert's reasoning and methodology. Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296 (8th Cir. 1996). The trial court is granted broad discretion in its determination of reliability. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142 (1999). However, the gatekeeper role should not invade the province of the jury whose job it is to decide issues of credibility and to determine the weight to be accorded such evidence. See Arkwright Mut. Ins. Co. v. Gwinner Oil Co., 125 F.3d 1176, 1183 (8th Cir. 1997). Expert testimony should be admitted if it is based on sufficient facts, it "is the product of reliable principles and methods," and "the witness has applied the principles and methods reliably to the facts of the case."

Fed. R. Evid. 702; see General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

The Eighth Circuit has set forth three prerequisites that must be met in order for expert testimony to be admitted under Rule 702.

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . ."

Lauzon v. Senco Products, Inc., 270 F.3d 681, 686 (8th Cir. 2001) (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[3] (2001)).

In the well-known case of Daubert v. Merrell Dow Pharmaceuticals Inc, 509 U.S. 579 (1993), the United States Supreme Court held that the "general acceptance" standard articulated in Frye was "not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence – especially Rule 702 – do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597. The Supreme Court has also held that the principles set forth in Daubert apply to all expert testimony. Kuhmo Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) ("We conclude that Daubert's general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."); accord Jaurequi v. Cater Manufacturing Co. Inc., 173 F.3d 1076, 1082 (8th Cir. 1999).

"In making that determination, the district court is free to evaluate one or all of the following factors: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique

9

has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community." Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 776-77 (8th Cir. 2004) (citing Daubert, 509 U.S. 579, 592-95)). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) (citing Kumho, 526 U.S. 137, 141-42)). There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant.

  Ford has retained experts Dr. Richard Mason (pathologist), Dr. Alan Donelson (Ph. D in pharmacology, B.A. chemistry), and Lowell Van Berkom (forensic toxicologist) to testify regarding the vitreous humor and urine samples. All three experts have converted the vitreous humor sample to a blood alcohol concentration level and intend to testify at trial as to their findings.

  Olson does not dispute the individual qualifications of the three defense expert witnesses. The crux of Olson's argument is that the conversion of a vitreous humor sample to a blood alcohol concentration level is scientifically unreliable. To support her argument, Olson notes the differing results of the three experts and suggests that the experts have not adequately considered the eyewitness testimony. Olson also notes that the coroner, Dr. John Smith, and the State Toxicologist, Margaret Pearson, do not endorse the conversion of vitreous humor to blood alcohol concentration.

  The Court has carefully reviewed the entire record, and particularly the written reports of each expert witness, as well as the discovery depositions taken to date. The Court finds that each of the experts' findings is based on scientific, technical, or other specialized knowledge that will be of assistance to the jury in determining the critical facts of the case. Each expert witness has

considered the statements of eyewitnesses prior to rendering an opinion on the matter. Each expert witness is qualified and has provided a detailed summary of his/her opinions and an explanation concerning the factual basis for the proffered opinions. The Court finds that the testimony offered by each expert witness is reliable and trustworthy from an evidentiary standpoint. In reaching that determination, the Court has considered each of the four factors outlined by the United States Supreme Court in Daubert, and endorsed by the Eighth Circuit. The theory and technique of converting vitreous humor to blood alcohol concentration can be tested, has been subjected to peer review and publication, has a known or potential error rate and standards controlling the technique's operation, and appears to be generally accepted within the scientific community.

Despite efforts to suggest that converting vitreous humor to a blood alcohol concentration level is an entirely novel concept, other courts have admitted this type of evidence. See Thier v. Lykes Bros., Inc., 900 F. Supp. 864, 869 (S.D. Tex. 1995); Rice v. Merchants Nat. Bank, 572 N.E.2d 439, 443 (Ill. Ct. App. 1991); Sweenhart v. Co-Con, Inc., 626 P.2d 310, 311 (N.M. Ct. App. 1981). Both Dr. Smith and Margaret Pearson, experts retained by Olson, recognize that vitreous humor fluid can be converted to a blood alcohol concentration level. See Deposition of John C. Smith, pp. 26-28; Deposition of Margaret Pearson, p. 37. Dr. Smith simply states that in his opinion there is no "gold standard" for making such a conversion. See Deposition of John C. Smith, pp. 26-28.[2]

The attacks by both parties regarding expert opinions as to the decedent's blood alcohol

---

[2] The Court is aware from its own background and experience that the medical community and medical literature support the general proposition that vitreous humor is a suitable body fluid for postmortem ethanol analysis. In traumatic deaths where blood is no longer available, or where the integrity of the blood is in doubt, blood alcohol levels can be inferred from corresponding alcohol levels in other body fluids and tissues. There are established blood to vitreous humor alcohol ratios and urine to blood alcohol ratios recognized throughout medical literature. See The American Journal of Forensic Medicine and Pathology, "Relationship Between Postmortem Blood and Vitreous Humor Ethanol Levels," Vol. 14, No. 4 (1993).

levels and alcohol consumption go to the weight and not the admissibility of the testimony. Many of Olson's concerns can be addressed by way of cross-examination. As the Supreme Court emphasized in Daubert, 509 U.S. at 595-596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Olson will have a full opportunity to cross-examine each of Ford's experts and highlight the shortcomings of their testimony. The Court's gatekeeper role should not invade the province of the jury whose job it is to decide issues of credibility and to determine the weight to be accorded such evidence. The trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system.

Olson will also be permitted to rebut Ford's experts with the testimony of expert Anne Rummel Manly. As with Ford's experts, the Court finds that Manly is also well-qualified to render an opinion on the subject matter at issue and her testimony is relevant and reliable under Rule 702 of the Federal Rules of Civil Procedure and Daubert.

### 3)    RULE 403

The Court must also address Olson's concerns regarding the cumulative nature of Ford's three experts, namely that each will testify regarding the conversion of vitreous humor to a blood alcohol concentration level. As previously explained, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by <u>considerations of undue delay, waste of time, or needless presentation of cumulative evidence</u>." Fed. R. Evid. 403 (emphasis added). "Cumulative evidence is not bad per se; it is the 'needless presentation' that is to be avoided." 22A Charles Alan Wright

& Kenneth W. Graham, Jr., Federal Practice and Procedure § 5220 (1978). District courts have broad discretion to place reasonable limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence. United States and Cas. Co. v. Historic Preservation Trust, 265 F.3d 722, 727-28 (8th Cir. 2001) (citing First Nat'l Bank and Trust Co. v. Holingsworth, 931 F.2d 1295, 1304 (8th Cir. 1991)).

Each of Ford's three experts (Mason, Donelson, and Van Berkom) are offering an opinion about the conversion of vitreous humor fluid to a blood alcohol concentration level. Ford has explained that the experts are not retained solely for that purpose. Each will offer expert testimony from a different scientific discipline, namely pathology, toxicology/chemistry, and the effects of alcohol on humans. Specifically, Dr. Mason will testify about Olson's injuries and the resulting autopsy. Dr. Mason has particular expertise in the process of obtaining and handling samples. Dr. Donelson will testify about the effects of alcohol on the human body and the role alcohol consumption may have played in the accident. Apparently, this testimony will be primarily used to rebut the testimony of Anne Rummel Manly.

The Court, in its discretion, finds that the cumulative nature of the testimony of Ford's experts regarding the conversion of vitreous humor to blood alcohol concentration does not justify the wholesale exclusion of their testimony under the circumstances. Both parties will be presenting numerous witnesses who will address the subject of the reliability or unreliability of converting vitreous humor samples to a blood alcohol concentration, and the decedent's consumption of alcohol and his level of intoxication the evening of September 17, 1002. Ford has three witnesses to address this subject matter (Mason, Donelson, and Van Berkom) and the Plaintiff has three witnesses (Smith, Pearson, Manly). All are qualified by background, training, and experience and all have differing

opinions as to the reliability of converting vitreous humor fluid to a blood alcohol concentration level. There is a medically reliable and corresponding relationship between postmortem blood and vitreous humor alcohol content which does not equate with junk science. The attacks by both parties relative to the opinions to be offered by the witnesses go to the weight rather than the admissibility of such testimony.

### C.     DEPUTY POLUMBO

#### 1)     ACCIDENT REPORT

Ford also seeks to exclude Deputy Todd Polumbo's statement in the Motor Vehicle Crash Report dated September 21, 2002, which reads: "It does not appear alcohol was a contributing factor to the crash." See Motor Vehicle Crash Report, dated September 21, 2002. The report and statement are clearly hearsay. See Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Hearsay is inadmissible unless there is an applicable exception. See Fed. R. Evid. 802. Rule 803(8) of the Federal Rules of Evidence permits the following type of hearsay evidence even though the declarant is available as a witness:

> **(8) Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
>
> "The public records and reports exception rests on 'the assumption that a public official will

perform his duty properly and the unlikelihood that he will remember details independently of the record.'" Kehm v. Proctor & Gamble Mfg. Co., 724 F.2d 613, 618 (8th Cir. 1983) (citations omitted). "The rule 'assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present.'" Id. It is well-established that the burden is on the party opposing admission to prove the report's untrustworthiness. Amtrust Inc. v. Larson, 388 F.3d 594, 599 (8th Cir. 2004). Rule 803(8) is often used to admit police reports. See Foster v. General Motors Corp., 20 F.3d 838 (8th Cir. 1994).

Ford relies primarily on the Eighth Circuit case of Faries v. Atlas Truck Body Mfg. Co., 797 F.2d 619 (8th Cir. 1986), in seeking to exclude Deputy Polumbo's report. Faries involved a motor vehicle accident between a motorcycle and a milk truck which was investigated by a highway patrol trooper shortly after the accident. The trooper's investigation included a small number of measurements, a schematic drawing of the accident scene, and an interview of the milk truck driver and his son. At trial, a portion of the trooper's accident report was admitted into evidence. Id. at 621. The admitted portion of the accident report included the trooper's written statement that "[a]pparantly [Faries] was driving at an excessive rate of speed, lost control on a curve, crossed over the center line, overturned and slid under [the milk truck]." Id. at 623. The motorcyclist argued that the inadequacy of the investigation and the use of biased sources of information demonstrated a lack of trustworthiness regarding the accident report under Rule 803(8) of the Federal Rules of Evidence.

On review, the Eighth Circuit agreed. The Court held that the statement in the accident report "was essentially [the trooper's] opinion about the cause of the accident in written form, rather than investigatory finding." Id. at 623 (citing Dallas & Mavis Forwarding Co. v. Stegall, 659 F.2d 721, 722 (6th Cir. 1981)). The report contained little physical data or evidence to support its

15

conclusion, and was based largely on statements of an interested witness, namely the milk truck driver. For that reason, the Eighth Circuit concluded that the accident report lacked trustworthiness and should not have been admitted as a public record, and to do so was reversible error. 797 F.2d 619, 623-24.

Like Faries, Deputy Polumbo's Motor Vehicle Crash Report dated September 21, 2002, contains little or no physical data or evidence to support his finding regarding the role of alcohol. The only physical data or evidence, although it is not reflected in the report itself, is that Deputy Polumbo put his head into the passenger side of the vehicle and did not detect an odor of alcohol. See Deposition of Deputy Todd Polumbo, pp. 36-37. Like Faries, Deputy Polumbo's finding is based primarily on statements of interested witnesses. Deputy Polumbo spoke with the Minot Country Club superintendent Bruce Ruppert as evidenced by his deposition.

> Q: All right. And at some point did you ask Ruppert to go back to the clubhouse to ask some questions about Mr. Olson's alcohol consumption that night?
>
> A: Yes, I did. Like I said before, I know Bruce. I stopped and talked to him. I didn't get back to follow up, but what I asked him to do was go to the clubhouse, talk to the bartender and maybe see if we could get a bar tab, if there was anything. He did go in and speak to somebody, and he did come back out and talk to me.
>
> Q: What did he tell you?
>
> A: What he told me, the person who runs the golf cart out on the course said that she only remembers selling two beers to Mr. Olson and the person he was golfing with. And I believe the bar tab, if – and this would be totally speculation, because I do not remember, but I believe there was only two to four drinks bought at the clubhouse, if I remember right. That sticks in my mind, but I'm not a hundred percent sure on that. So at that point, with not smelling the alcohol and it appears that there wasn't that much consumed, at that point I didn't feel that any more investigation on whether alcohol was involved was needed.

See Deposition of Deputy Todd Polumbo, pp. 37-38. Due to the nature of dram shop liability, Bruce Ruppert cannot be said to be a totally disinterested witness. As superintendent, he arguably had

16

reason to mitigate the role of the Minot Country Club by downplaying the amount of alcohol sold and consumed. Deputy Polumbo admits that those two pieces of information are the sole basis for his written assessment that alcohol was not a contributing factor in the accident. Id. at 39.

The Court finds that the opinion of Deputy Polumbo as to the role alcohol may have played in the cause of the accident, as set forth in the Motor Vehicle Crash Report, indicates a lack of trustworthiness and inadmissible hearsay. See Fed. R. Evid. 803(8). The report is based on an inspection of the vehicle and statements made by the Minot Country Club superintendent. Such an "investigation" does not warrant or support Deputy Polumbo's written finding that alcohol was not a contributing factor in the accident. The conclusion is simply conjecture in written form. The Court further finds that even if Deputy Polumbo's opinion in the report is deemed relevant and admissible, the probative value of the statement in the report is substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403. In summary, Olson will not be allowed to introduce, comment on, or rely upon Deputy Polumbo's statement that alcohol was not a contributing factor to the accident, as set forth in the Motor Vehicle Crash Report dated September 21, 2002.

### 2) **OPINION TESTIMONY**

As an extension of its previous argument, Ford also contends that Deputy Polumbo should not be permitted to testify regarding his opinion that alcohol was not a contributing factor to the crash. A lay witness "may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Opinion testimony by lay witnesses is limited "to those opinions or inferences which are (a) rationally based

17

on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Expert witnesses are given much greater latitude on these issues. See Fed. R. Evid. 702.

Deputy Polumbo has never been identified as an expert witness and he may not testify in that capacity at trial. However, Deputy Polumbo is allowed to testify as a fact witness and Polumbo can testify that he did not detect the odor of alcohol in Olson's vehicle during the post-accident inspection. See Deposition of Deputy Polumbo, pp. 36-37. Polumbo can also testify as to other personal observations that he may have made relative to physical evidence in and around the Ford Explorer and on or near the roadway. However, any testimony Deputy Polumbo would offer concerning his opinion as to the role that alcohol may have played as a contributing factor to the accident would be unreliable. The Court also finds that even if such opinion testimony by Deputy Polumbo would be deemed relevant and reliable, the probative value of such testimony is substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403. Finally, with respect to Deputy Polumbo's discussions with Bruce Ruppert, the manager of the Minot Country Club, such discussions are classic hearsay and inadmissible if Ruppert does not testify at trial. It is clear that Bruce Ruppert will testify and both parties will have sufficient opportunity to examine Ruppert at trial. If Ruppert's testimony is inconsistent with statements that he may have made to Deputy Polumbo, then Polumbo could be called for impeachment purposes.

### III.  CONCLUSION

For the reasons set forth above, the Ford Motor Company's Motion in Limine No. 7 to Exclude Alcohol Opinion of Todd Columbo (Docket No. 80) is **GRANTED**; Ford Motor Company's Motion in Limine No. 9 to Exclude Expert Testimony of Anne Rummel Manly (Docket No. 82) is **DENIED**; Olson's Motion in Limine No. 2 to Exclude Reference to Alcohol Consumption (Docket No. 86) is **DENIED**; and Olson's Motion in Limine No. 13 Regarding Cumulative Expert Testimony by Ford Regarding Alcohol (Docket No. 97) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 26th day of January, 2006.

[signature]

Daniel L. Hovland, Chief Judge
United States District Court